RECEIVED
DEC 3 0 2005
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

ORIGINAL

# In The United States Court of Federal Claims

ECF

## Cover Sheet

05-1395

Plaintiff(s) or Petitioner(s)
John D. and Susan B. Morris

If this is a multi-plaintiff case, pursuant to RCFC 20(a), please attached an alphabetized, numbered list if all plaintiffs

Name of the attorney of record: [See RCFC 83.1(c)] Jeff H. Eckland

Firm Name: Eckland & Blando LLP

Post Office Box: ______________________

Street Address: 500 Lumber Exchange, 10 South Fifth Street

City-State-Zip: Minneapolis, MN 55402

Telephone & Facsimile Numbers: Phone: (612)236-0160 Fax: (612)236-0179

E-mail address: ecklandandblando@aol.com

Is the attorney of record admitted to the Court of Federal Claims Bar? Yes
If **NO**, please call (202) 219-9630 for admission papers and instructions.

Nature of suit code: 1 3 4

Select only one [three digit] nature of suit code from attached sheet and if numbers 118, 134, 226, 312, 356 or 528 are used, please explain.

______________________________________________

______________________________________________

Government Agency Involved: A G R

See attached Sheet for three digit code.

Amount Claimed: $ To be determined
If to be determined, put the phrase "to be determined" in Amount Claimed Space.

Vaccination Date: (Vaccine Cases Only) ______________

If this case is related to any pending or previous case you are **required** to file a separate notice of related case(s). See RCFC 40.2

Receipt #064217

ORIGINAL

ECF

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
DEC 30 2005
U.S. COURT OF FEDERAL CLAIMS

JOHN D. & SUSAN B. MORRIS,
P.O. Box 250,
Camden, ME 04843

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

**COMPLAINT FOR BREACH OF CONTRACT AND JUST COMPENSATION**

**File No.** 05-1393C

For their Complaint against the defendant United States of America, plaintiffs state and allege as follows:

**PRELIMINARY ALLEGATIONS**

1. Plaintiffs contracted with the United States of America ("the Government") for one loan to provide rental housing for low- and moderate-income persons for so long as the loan obligations remained unsatisfied ("the housing program"). The Government entered into this contract ("the contract") with plaintiffs by and through its agency, the Farmers Home Administration, United States Department of Agriculture ("FmHA").

2. The terms of this contract permit plaintiffs to terminate their participation in the Government's housing program "at the option" of plaintiffs upon prepayment of their federally made or insured mortgage. Pursuant to the contract, said optional termination right could be exercised by plaintiffs "at any time" prior to the termination of the fifty (50)-year term of their contract.

3. Congress in 1988 and 1992 enacted legislation that repudiated the Government's contractual obligation to permit FmHA contract holders to terminate their contracts at any time at their option. As is alleged more fully below, plaintiffs contend in this action that the enactment of this legislation anticipatorily repudiates the contract between defendant and plaintiffs. As is their right, plaintiffs have elected to treat the Government's anticipatory repudiation as a breach of contract as of the date of Government performance required by the contract, i.e., the date that plaintiffs would achieve their option of terminating their contract but for the Government's repudiation. Plaintiffs also allege that said legislation results in a taking of plaintiffs' property without just compensation.

4. Plaintiffs seek to recover in this action the damages they have suffered and continue to suffer as a result of the breach by the Government of plaintiffs' contract and for just compensation for the taking of their property.

**(Pre-1979 FmHA Contract)**

5. Plaintiffs entered into their FmHA contract before December 21, 1979 ("the pre-1979 FmHA contract"), and thereby are contractually entitled to terminate their participation in the Government's housing program by exercising their option to prepay at any time. Such a prepayment would enable them to "go to market" and use or dispose of their property by either (i) raising the property's rents to commercial rates; or (ii) selling the property for their commercial fair market value.

6. The 1988 Legislation described below repudiated the contractual right of pre-1979 FmHA contract holders to terminate their contracts at any time at their option.

## THE PARTIES
**(Party Plaintiff)**

7. Plaintiffs, John D. & Susan B. Morris, with an address at P.O. Box 250, Camden, ME 04843, entered into one contract for rental housing at the following property known as:

(i) Coles Hills Apartments, case and project number 23-08-15346926, consisting of twenty-four (24) units, which closed on November 19, 1979.

**(Party Defendant)**

8. The FmHA is an agency of the defendant. At all times relevant to the allegations in this Complaint, FmHA and its respective officials and employees were acting as agents of the defendant. Pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, § 233, 108 Stat. 3178 (1994), the Secretary of the Department of Agriculture was authorized to establish a successor agency to Farmers Home Administration known as Rural Housing and Community Development Services ("RHCDS"). Effective January 30, 1996, RHCDS changed its name to Rural Housing Service ("RHS"). (Agency Name Change, 61 Fed. Reg. 2899 (1996).) RHS is itself part of the area within the Department of Agriculture known as "Rural Development." As used herein, "FmHA" shall refer to Farmers Home Administration or its successor agencies, as appropriate.

9. An actual controversy exists between the parties.

## JURISDICTION

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491.

**BACKGROUND**

11. Prior to the 1960s, Congress sought to provide low-income housing primarily by subsidizing projects developed, owned, and managed by local government public housing authorities. During the 1960s and the 1970s, Congress changed its approach and enacted legislation to encourage private developers to construct, own, and manage large numbers of federally assisted housing units for low- and moderate-income residents.

12. In furtherance of this changed approach, Congress authorized FmHA to make or insure loans to private entities in order to stimulate the private development of federally assisted housing for low- and moderate-income and elderly residents in rural areas of the United States. Congress began this program in 1962 by adding Section 515 to the Housing Act of 1949 (Pub. L. No. 87-723, § 4(b), 76 Stat. 671 (1962)) and expanded its scope in 1968 by adding Section 521 to that Act (Pub. L. No. 90-448, Tit. X, § 1001, 82 Stat. 551 (1968))(now codified at 42 U.S.C. §§ 1485 and 1490a, respectively). Housing projects subject to Sections 515 and/or 521 of the Housing Act of 1949 are referred to herein as "FmHA projects."

13. Plaintiffs agreed, under Sections 515 and/or 521 of the Housing Act of 1949, as amended, 42 U.S.C. §§ 1485 and 1490a, to construct, rehabilitate, or improve one housing project and to enter into a Loan Agreement with the FmHA. The Loan Agreement, *inter alia*, imposed significant obligations on plaintiffs regarding the tenants to whom plaintiffs could rent, the rents they could charge, the profits they could receive, and the maintenance and financial operation of the project ("the low income affordability restrictions").

14. Contemporaneous with the execution of the Loan Agreement, and referenced therein, the plaintiffs executed, *inter alia*, a Promissory Note and Real Estate Mortgage for the project. In executing the Promissory Note, plaintiffs promised to pay to the order of the Government, in scheduled installments, the entire principal due pursuant to the Loan Agreement, together with interest at a specified rate. The Promissory Note provided, *inter alia*, "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower."

15. By signing the Loan Agreement and the Promissory Note referenced therein, plaintiffs promised, *inter alia*, (i) to construct and maintain housing in accordance with FmHA's specifications; (ii) to use their FmHA project for the purpose of housing people eligible for occupancy as provided by Section 515 and appropriate FmHA regulations; (iii) to charge no higher rents than those permitted by FmHA; (iv) to make timely payments on their mortgages; and (v) to maintain certain cash reserves. In exchange, the Government agreed to allow plaintiffs to free themselves of FmHA's regulatory strictures in accordance with the contractual provisions of the Promissory Note.

16. The Loan Agreement obligates the plaintiffs to operate their housing property in accordance with FmHA regulatory strictures only so long as plaintiffs' indebtedness and other obligations under the Promissory Note, Real Estate Mortgage, and any related agreement remain unsatisfied. Thus, plaintiffs' obligation under the Loan Agreement to operate their housing property in accordance with FmHA regulations expires upon their prepayment in full of their indebtedness and satisfaction of any related obligations.

17. Consistent with the language of the Promissory Note, FmHA regulations codified at, *inter alia,* parts 1865, 1866, and 1965, implementing Section 502 of the Housing Act of 1949, 42 U.S.C. § 1472, permit plaintiffs to prepay their mortgage loan at any time at their option, so long as they and their successors in interest continued to comply with the restrictive-use clause contained in the Real Estate Mortgage.

18. Accordingly, plaintiffs are entitled under their Loan Agreement with FmHA, FmHA's regulations, and the Promissory Note, to terminate their contract by prepaying their mortgage loan at any time at their option to enable them to go to market and maximize their return on investment.

19. Notwithstanding plaintiffs' contractual right to terminate their participation in the Government's housing programs, the Government repudiated its obligation to recognize plaintiffs' right by enacting the legislation described below.

## **CONGRESSIONAL ACTION**

### **The 1988 Legislation**

20. On February 5, 1988, Congress imposed restrictions on prepayment, thereby repudiating the right of pre-1979 FmHA contract holders to exercise their contractual termination right at any time at their option, by enacting Title II of the Housing and Community Development Act of 1987. (Pub. L. No. 100-242, 101 Stat. 1877 (1988), cited as the Emergency Low Income Housing Preservation Act of 1987 (codified as amended at 42 U.S.C. § 1472(c) and 12 U.S.C. § 1715*l* note)("the 1988 Legislation" or "ELIHPA").) Congress made certain findings in the 1988 Legislation, including but not limited to the following:

(i) some 150,000 units of rural low income housing financed under section 515 of the Housing Act of 1949 [i.e., FmHA housing units] are threatened with loss as a result of the prepayment of mortgages by owners;

(ii) the loss of this privately owned and federally assisted housing would occur in a period of sharply rising rents on unassisted housing and extremely low production of additional low rent housing;

(iii) a major review of alternative responses to this threatened loss of affordable housing is now being undertaken by numerous private sector task forces as well as State and local organizations;

(iv) until the Congress can act on recommendations that will emerge from this review, interim measures are needed to avoid the irreplaceable loss of low income housing and irrevocable displacement of current tenants.

(The 1988 Legislation, Section 202(a).)

**(The 1988 Legislation's Prepayment Restrictions For Pre-1979 FmHA Contracts)**

21. Congress estimated that a large portion of the 367,000 units owned by both pre-1979 and post-1979 loan holders and originating between 1963 and 1985 were vulnerable to being prepaid during the few years following 1988. Post-1979 FmHA loan holders, however, unlike pre-1979 loan holders, already were contractually required to maintain their projects as low- and moderate-income housing for fifteen (15) or twenty (20) years. Thus, until such time as Congress could act on recommendations resulting from the continuing reviews of alternative responses to the perceived imminent loss of affordable housing and devise a permanent solution for all FmHA loans, the 1988 Legislation confined itself to

dealing only with the pre-1979 FmHA loans, i.e., those FmHA loans originating from 1963 to 1979.

22. The 1988 Legislation contained measures designed to place the pre-1979 FmHA contract holders "on the same playing field" as the post-1979 FmHA contract holders already subject to a restrictive-use clause. For example, a pre-1979 FmHA contract holder could avoid a forced sale of its project by agreeing to extend its low-income use for a period of not less than twenty (20) years from the date of loan origination. (The 1988 Legislation, Section 241.)

23. Although denominated as an "interim measure," the 1988 Legislation specifically amended existing law -- Section 502(c) of the Housing Act of 1949 -- and did not expire automatically. Instead of repealing the "interim measures" directed at pre-1979 FmHA contract holders, Congress devised, in 1992, a permanent response for all FmHA loans, including those post-1979 loans with contractual termination rights.

24. Consistent with the provisions of existing post-1979 FmHA contracts containing restrictive-use clauses, the 1988 Legislation recognized the contractual right of post-1979 FmHA loan holders to terminate their contracts by prepaying their loans at any time at their option provided that the projects were maintained as low- and moderate-income housing for a period of fifteen (15) or twenty (20) years from the date of loan origination.

25. Contrary to the provisions of pre-1979 FmHA contracts, the 1988 Legislation repudiated the contractual right of FmHA contract holders to terminate their contracts at any time at their option. (The 1988 Legislation, Section 241.)

## The 1992 Legislation

26. On October 28, 1992, Congress amended Section 502(c) of the Housing Act of 1949 by enacting the Housing and Community Development Act of 1992 (Pub. L. No. 102-550, § 2 & Tit. VII, § 712, 106 Stat. 3681, 3841 (1992)(codified in relevant part at 42 U.S.C. § 1472(c))("the 1992 Legislation or Title VII").) This amendment eliminated the interim measure status of the 1988 Legislation's provisions repudiating the contractual right of pre-1979 FmHA loan holders to terminate their contracts at any time at their option.

27. In addition to making permanent the temporary repudiation of the contractual termination rights of pre-1979 FmHA loan holders, the 1992 Legislation made permanent for all contracts formed before 1989 the restrictions that ELIHPA had imposed on pre-1979 FmHA contracts. (42 U.S.C. § 1472(c)(4)(A), as amended.)

28. For the first time, the 1992 Legislation permanently applied ELIHPA's restrictions to all FmHA contracts entered into before 1989. The statute made no exception for contracts entered into before 1979, nor did it single out (as ELIHPA had done for pre-1979 contracts) any special treatment for those contracts entered into between 1979 and 1989. Thus, the 1992 Legislation, signed into law by the President on November 2, 1992, together with implementing regulations, permanently repudiates the contractual termination right of any FmHA loan holder who chooses to terminate its contract.

29. Pursuant to the 1992 Legislation, holders of both pre-1979 and post-1979 FmHA contracts are permitted to terminate their contracts by prepaying their loans only in accordance with specified, non-contractual restrictions, including but not limited to the requirement that, before accepting any offer to prepay, the Secretary must make reasonable

efforts to enter into an agreement to extend the low-income use of FmHA projects for not less than a period of twenty (20) years beginning on the date the agreement is executed. (The 1992 Legislation, Section 712, 42 U.S.C. § 1472(c)(4)(A).)

30. The 1992 Legislation authorizes FmHA, subject to various conditions and at its discretion, to offer limited, specified "incentives" to holders of FmHA contracts which, along with the threat of the forced property sales discussed below, are designed to induce said contract holders to extend the low-income use of their projects. In general, the incentives allowed owners whose projects satisfied various guidelines to apply for: (i) increases in the rate of return on investment; (ii) reductions of the interest rate on the mortgage loan; (iii) additional rental assistance; and (iv) an equity loan. (42 U.S.C. § 1472(c)(4)(B).)

31. The appraisal guidelines used by FmHA to determine incentives are inconsistent with standard appraisal guidelines and result in value determinations below fair market value.

32. For those FmHA project owners unwilling or unable to extend their participation in the Government's housing programs by acquiescing to the "incentives" outlined above, the 1992 Legislation provides for forced sales of said owners' properties to nonprofit organizations or public agencies approved by FmHA which are required to maintain the projects as low income housing, subject to FmHA's approval of financial assistance to the prospective purchasers. Under the lengthy, cumbersome, and costly procedures required, such owners are required to offer their properties for sale to such purchasers for an extended period without receiving "incentives" or any other compensation. (42 U.S.C. § 1472(c)(5)(A) - (F).)

33. Such forced sale proceedings can be avoided only if (i) the FmHA project owner agrees to continue to operate its project as low-income housing for a period determined by the Secretary, but not less than twenty (20) years from the date of loan origination, and to subject itself to the forced sale proceeding at the end of that period; or (ii) if the Secretary determines that housing opportunities for minorities will not be materially affected as a result of the prepayment and that either (a) tenants will not be displaced; or (b) there is an adequate supply of affordable rental housing within the market area of the housing that is assured of being made available to all current tenants. (42 U.S.C. § 1472(c)(5)(G).)

**Material Terms**

34. Plaintiffs' contractual right to terminate their contract at any time at their option was a material term of their contract. In the absence of this contractual termination right, plaintiffs would not have entered into their contract with FmHA. But for the legislation repudiating plaintiffs' contractual termination right, plaintiffs would achieve their option of terminating their contract on those dates that would maximize their investment return on their property, or on such other dates as they would deem appropriate given their individual circumstances.

35. Plaintiffs have complied fully and in good faith in all material respects with the terms and conditions of their contract and have otherwise fully performed their undertakings in connection therewith.

**THE IMPACT OF THE REPUDIATING LEGISLATION UPON PLAINTIFFS**

36. The statutory scheme under the 1988 and 1992 Legislation and FmHA's implementing regulations repudiate the contractual right of FmHA project owners to

terminate their contracts at any time at their option in part by (i) compelling them to extend the low-income use of their properties; and (ii) subjecting them to forced sales of their properties. The Government's repudiation does not constitute a failure to carry out any immediate duty of present performance unless and until the date of Government performance required by each contract arrives, i.e., the date that any FmHA contract holder would have achieved its option of terminating its contract but for the Government's repudiation. Thus, the Government's scheme constitutes an anticipatory repudiation of the plaintiffs' contractual termination right.

37. The legislation complained of herein also results in a taking of plaintiffs' property for public use without just compensation. By requiring plaintiffs to house low-income tenants and to accept new low-income tenants, the Government has (i) conscripted plaintiffs' property for public use; (ii) physically invaded or authorized others to physically invade plaintiffs' property; and (iii) deprived plaintiffs of their distinct investment-backed expectations with regard to their properties, all without providing any just compensation.

## DAMAGES

38. Plaintiffs intended, upon entering into their contract with the FmHA, to exercise their prepayment right and terminate their participation in the Section 515 program prior to the expiration of their full mortgage term. But for the Government's wrongful repudiation, plaintiffs would have prepaid their mortgage loan for the pre-1979 project at issue here, Coles Hills Apartments, on or about March 14, 2005.

39. Thus, the plaintiffs commenced this civil action within six years after (1) the date that they intended to prepay their mortgage loan and terminate their contract with the

FmHA, and (2) the date that they would have prepaid but for the Government's repudiation of their contract rights.

40. Plaintiffs were ready, willing, and able to pay off their mortgage loan balance at the time they intended to exercise their right to prepay and leave the Section 515 program.

41. Plaintiffs have met with, or otherwise made inquiries of, FmHA officials regarding prepayment of their loan. Said Government officials have repeatedly represented to plaintiffs that prepayment without restrictions will not be accepted.

42. Notwithstanding the Government's conduct, on or about March 14, 2005 plaintiffs submitted a request for the prepayment of their mortgage loan. The Government has failed and refused to accept any prepayment from plaintiffs pursuant to the provisions of their contract.

43. The incentives and other alternatives potentially provided by the 1988 and 1992 Legislation and implementing regulations are wholly inconsistent with plaintiffs' original contract rights. Among other things, said incentives and alternatives would require plaintiffs to negotiate substitute alternative transactions with the party that repudiated their contract, thereby exposing them to unreasonable financial risks. Moreover, said incentives and alternatives fall far short of compensating plaintiffs for the damages they have suffered and will continue to suffer as a result of the Government's repudiation of their contract with plaintiffs, and would not provide just compensation to plaintiffs for the taking of their property for public use.

44. As a result of the Government's repudiation of their contractual termination right, plaintiffs have been (i) deprived of their right to use or dispose of their property as they

see fit; (ii) compelled to allow the Government to use or authorize others to purchase and use their property to fulfill the Government's undertaking to provide low cost rental housing to a segment of the public meeting Government eligibility standards; and (iii) required to continue to comply with the costly restrictions and obligations imposed upon them by their Loan Agreement.

45. But for the Government's conduct, plaintiffs would have terminated their contract by prepaying their mortgage loan and/or selling their property to third parties. The Government has deprived and will deprive plaintiffs of earnings on the sale of their property because its repudiation of plaintiffs' contractual termination right has prevented any prepayment, and consequently any sale, from taking place.

46. But for the Government's conduct, plaintiffs would have terminated their contract by prepaying their mortgage loan and converting their property into commercial housing for which they could obtain rents at market rates in excess of the rents chargeable to low- and moderate-income tenants under the Government's program. The Government has deprived and will deprive plaintiffs of the value of increased rents they would receive because its repudiation of plaintiffs' contractual termination right has prevented any prepayment, and consequently any increase in rents, from taking place.

47. Plaintiffs have suffered other, additional damages including without limitation the lost opportunity costs associated with investment and business opportunities plaintiffs have been foreclosed from pursuing by virtue of their inability to exercise their contractual right to terminate their contract at any time at their option.

## COUNT ONE

(Breach of Contract)

48. Plaintiffs incorporate paragraphs 1 through 47 by reference as if fully set forth herein.

49. Defendant's legislation anticipatorily repudiated the contract between the defendant and plaintiffs. The Government's anticipatory repudiation has deprived and will deprive plaintiffs of their contractual right to terminate their contract at any time at their option before the expiration date of their fifty (50)-year contract term. The Government's anticipatory repudiation constitutes a breach of plaintiffs' contract as of the date of Government performance required by the contract, i.e., the date that plaintiffs would terminate their contract but for the Government's repudiation.

50. As a direct and proximate result of defendant's conduct, plaintiffs have been damaged in an amount which will be proven at trial. Plaintiffs are continuing to suffer injury and resulting damages each day that they are denied the ability to exercise their contractual termination right and go to market with their property at any time at their option.

## COUNT TWO

(Just Compensation)

51. Plaintiffs incorporate paragraphs 1 through 50 by reference as if fully set forth herein.

52. As of the date of Government performance required by the contract entered into between defendant and plaintiffs, defendant's conduct constitutes a taking of plaintiffs'

real and intangible property interests for public use and requires payment to plaintiffs of just compensation under the Fifth Amendment to the U.S. Constitution.

53. Plaintiffs are entitled to just compensation for the taking of their property in an amount which will be proven at trial. Plaintiffs are continuing to suffer injury and resulting damages each day that they are denied the ability to convert their property to market rate or a conventional property.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for judgment as follows:

### AS TO COUNT ONE

1. That the Court award plaintiffs monetary relief for the damages suffered to date and for the damages plaintiffs continue to suffer as a result of defendant's breach of plaintiffs' contract, in an amount to be determined at trial.

### AS TO COUNT TWO

2. That the Court award plaintiffs just compensation during the period during which plaintiffs' property has been taken for public use by defendant, in an amount to be determined at trial.

### AS TO ALL COUNTS

3. That the Court award plaintiffs their attorneys' fees and expenses as allowed pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c), and other applicable law.

4. That the Court award plaintiffs their costs and interest as allowed by law.

5. That the Court grant such other and further relief as the law and the evidence may justify and as the Court may deem just and proper.

Dated: December 29, 2005

Respectfully submitted,

By: [signature]

Jeff H. Eckland

Attorney for Plaintiff

ECKLAND & BLANDO LLP
Mark J. Blando, Of Counsel
500 Lumber Exchange
10 South Fifth Street
Minneapolis, Minnesota 55402
Telephone: (612) 236-0160
Facsimile: (612) 236-0179

ORIGINAL

RECEIVED
DEC 3 0 2005
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

# In The United States Court of Federal Claims

ECF

## Cover Sheet

05-1394C

Plaintiff(s) or Petitioner(s)
Robert M. and Joan S. Moorehead

If this is a multi-plaintiff case, pursuant to RCFC 20(a), please attached an alphabetized, numbered list if all plaintiffs

Name of the attorney of record: [See RCFC 83.1(c)] Jeff H. Eckland

Firm Name: Eckland & Blando LLP

Post Office Box: ______________________

Street Address: 500 Lumber Exchange, 10 South Fifth Street

City-State-Zip: Minneapolis, MN 55402

Telephone & Facsimile Numbers: Phone: (612)236-0160 Fax: (612)236-0179

E-mail address: ecklandandblando@aol.com

Is the attorney of record admitted to the Court of Federal Claims Bar? Yes
If **NO**, please call (202) 219-9630 for admission papers and instructions.

Nature of suit code: [1] [3] [4]

Select only one [three digit] nature of suit code from attached sheet and if numbers 118, 134, 226, 312, 356 or 528 are used, please explain.

______________________________________________

______________________________________________

Government Agency Involved: [A] [G] [R]

See attached Sheet for three digit code.

Amount Claimed: $ To be determined
If to be determined, put the phrase "to be determined" in Amount Claimed Space.

Vaccination Date: (Vaccine Cases Only) ______________

If this case is related to any pending or previous case you are **required** to file a separate notice of related case(s). See RCFC 40.2

Receipt # 064216

ORIGINAL

ECF

FILED
DEC 30 2005
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

| | |
|---|---|
| ROBERT M. AND JOAN S. MOOREHEAD,<br>P.O Box 24,<br>Paris, ME 04271<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | **COMPLAINT FOR BREACH OF CONTRACT AND JUST COMPENSATION**<br><br><br><br>**File No.** ________________ |

---

For their Complaint against the defendant United States of America, plaintiffs state and allege as follows:

## PRELIMINARY ALLEGATIONS

1. Plaintiffs contracted with the United States of America ("the Government") for three loans to provide rental housing for low- and moderate-income persons for so long as the loan obligations remained unsatisfied ("the housing program"). The Government entered into these contracts ("the contracts") with plaintiffs by and through its agency, the Farmers Home Administration, United States Department of Agriculture ("FmHA").

2. The terms of these contracts permit plaintiffs to terminate their participation in the Government's housing program "at the option" of plaintiffs upon prepayment of their federally made or insured mortgages. Pursuant to the contracts, said optional termination right could be exercised by plaintiffs "at any time" prior to the termination of the fifty (50)-year term of their contracts.

3. Congress in 1988 and 1992 enacted legislation that repudiated the Government's contractual obligation to permit FmHA contract holders to terminate their contracts at any time at their option. As is alleged more fully below, plaintiffs contend in this action that the enactment of this legislation anticipatorily repudiates the contracts between defendant and plaintiffs. As is their right, plaintiffs have elected to treat the Government's anticipatory repudiation as a breach of contract as of the date of Government performance required by each contract, i.e., the date that plaintiffs would achieve their option of terminating each contract but for the Government's repudiation. Plaintiffs also allege that said legislation results in a taking of plaintiffs' properties without just compensation.

4. Plaintiffs seek to recover in this action the damages they have suffered and continue to suffer as a result of the breach by the Government of plaintiffs' contracts and for just compensation for the taking of their properties.

**(Pre-1979 FmHA Contracts)**

5. Plaintiffs entered into three FmHA contracts before December 21, 1979 ("the pre-1979 FmHA contracts"), and thereby are contractually entitled to terminate their participation in the Government's housing program by exercising their option to prepay at any time. Such a prepayment would enable them to "go to market" and use or dispose of their properties by either (i) raising the properties' rents to commercial rates; or (ii) selling the properties for their commercial fair market value.

6. The 1988 Legislation described below repudiated the contractual right of pre-1979 FmHA contract holders to terminate their contracts at any time at their option.

**THE PARTIES**
**(Party Plaintiff)**

7. Plaintiffs, Robert M. and Joan S. Moorehead, with an address at P.O. Box 24, Paris, ME 04271, entered into three contracts for rental housing at the following properties known as:

(i) Rustfield Village Elderly Apartments I, case and project number 23-029-004368227-01-8, consisting of twenty-four (24) units, which closed on or about December 18, 1975;

(ii) Rustfield Village Elderly Apartments II, case and project number 23-029-004368227-02-1, consisting of twenty-four (24) units, which closed on or about October 24, 1978; and

(iii) Sudbury Village Elderly Apartments, case and project number 23-029-004368227-03-1, consisting of twenty-four (24) units, which closed on or about January 12, 1977.

**(Party Defendant)**

8. The FmHA is an agency of the defendant. At all times relevant to the allegations in this Complaint, FmHA and its respective officials and employees were acting as agents of the defendant. Pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, § 233, 108 Stat. 3178 (1994), the Secretary of the Department of Agriculture was authorized to establish a successor agency to Farmers Home Administration known as Rural Housing and Community Development Services ("RHCDS"). Effective January 30, 1996, RHCDS changed its name to Rural Housing Service ("RHS"). (Agency Name Change, 61 Fed. Reg. 2899 (1996).)

RHS is itself part of the area within the Department of Agriculture known as "Rural Development." As used herein, "FmHA" shall refer to Farmers Home Administration or its successor agencies, as appropriate.

9. An actual controversy exists between the parties.

## JURISDICTION

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491.

## BACKGROUND

11. Prior to the 1960s, Congress sought to provide low-income housing primarily by subsidizing projects developed, owned, and managed by local government public housing authorities. During the 1960s and the 1970s, Congress changed its approach and enacted legislation to encourage private developers to construct, own, and manage large numbers of federally assisted housing units for low- and moderate-income residents.

12. In furtherance of this changed approach, Congress authorized FmHA to make or insure loans to private entities in order to stimulate the private development of federally assisted housing for low- and moderate-income and elderly residents in rural areas of the United States. Congress began this program in 1962 by adding Section 515 to the Housing Act of 1949 (Pub. L. No. 87-723, § 4(b), 76 Stat. 671 (1962)) and expanded its scope in 1968 by adding Section 521 to that Act (Pub. L. No. 90-448, Tit. X, § 1001, 82 Stat. 551 (1968))(now codified at 42 U.S.C. §§ 1485 and 1490a, respectively). Housing projects subject to Sections 515 and/or 521 of the Housing Act of 1949 are referred to herein as "FmHA projects."

13. Plaintiffs agreed, under Sections 515 and/or 521 of the Housing Act of 1949, as amended, 42 U.S.C. §§ 1485 and 1490a, to construct, rehabilitate, or improve three housing properties and to enter into Loan Agreements with the FmHA. The Loan Agreements, *inter alia*, imposed significant obligations on plaintiffs regarding the tenants to whom plaintiffs could rent, the rents they could charge, the profits they could receive, and the maintenance and financial operation of each property ("the low income affordability restrictions").

14. Contemporaneous with the execution of the Loan Agreements, and referenced therein, the plaintiffs executed, *inter alia*, a Promissory Note and Real Estate Mortgage for each property. In executing the Promissory Notes, plaintiffs promised to pay to the order of the Government, in scheduled installments, the entire principal due pursuant to the Loan Agreements, together with interest at a specified rate. The Promissory Notes provided, *inter alia*, "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower."

15. By signing the Loan Agreements and the Promissory Notes referenced therein, plaintiffs promised, *inter alia*, (i) to construct and maintain housing in accordance with FmHA's specifications; (ii) to use their FmHA projects for the purpose of housing people eligible for occupancy as provided by Section 515 and appropriate FmHA regulations; (iii) to charge no higher rents than those permitted by FmHA; (iv) to make timely payments on their mortgages; and (v) to maintain certain cash reserves. In exchange, the Government agreed to allow plaintiffs to free themselves of FmHA's regulatory strictures in accordance with the contractual provisions of the Promissory Notes.

16. The Loan Agreements obligate the plaintiffs to operate their housing properties in accordance with FmHA regulatory strictures only so long as plaintiffs' indebtedness and other obligations under each Promissory Note, Real Estate Mortgage, and any related agreement remain unsatisfied. Thus, plaintiffs' obligation under the Loan Agreements to operate their housing properties in accordance with FmHA regulations expires upon their prepayment in full of their indebtedness and satisfaction of any related obligations.

17. Consistent with the language of the Promissory Notes, FmHA regulations codified at, *inter alia,* parts 1865, 1866, and 1965, implementing Section 502 of the Housing Act of 1949, 42 U.S.C. § 1472, permit plaintiffs to prepay their mortgage loans at any time at their option, so long as they and their successors in interest continue to comply with the restrictive-use clause contained in the Real Estate Mortgages.

18. Accordingly, plaintiffs are entitled under their Loan Agreements with FmHA, FmHA's regulations, and each Promissory Note, to terminate their contracts by prepaying their mortgage loans at any time at their option to enable them to go to market and maximize their return on investment.

19. Notwithstanding plaintiffs' contractual right to terminate their participation in the Government's housing program, the Government repudiated its obligation to recognize plaintiffs' right by enacting the legislation described below.

## CONGRESSIONAL ACTION

### The 1988 Legislation

20. On February 5, 1988, Congress imposed restrictions on prepayment, thereby repudiating the right of pre-1979 FmHA contract holders to exercise their contractual

termination right at any time at their option, by enacting Title II of the Housing and Community Development Act of 1987. (Pub. L. No. 100-242, 101 Stat. 1877 (1988), cited as the Emergency Low Income Housing Preservation Act of 1987 (codified as amended at 42 U.S.C. § 1472(c) and 12 U.S.C. § 1715*l* note)("the 1988 Legislation" or "ELIHPA").) Congress made certain findings in the 1988 Legislation, including but not limited to the following:

> (i) some 150,000 units of rural low income housing financed under section 515 of the Housing Act of 1949 [i.e., FmHA housing units] are threatened with loss as a result of the prepayment of mortgages by owners;
>
> (ii) the loss of this privately owned and federally assisted housing would occur in a period of sharply rising rents on unassisted housing and extremely low production of additional low rent housing;
>
> (iii) a major review of alternative responses to this threatened loss of affordable housing is now being undertaken by numerous private sector task forces as well as State and local organizations;
>
> (iv) until the Congress can act on recommendations that will emerge from this review, interim measures are needed to avoid the irreplaceable loss of low income housing and irrevocable displacement of current tenants.

(The 1988 Legislation, Section 202(a).)

**(The 1988 Legislation's Prepayment Restrictions For Pre-1979 FmHA Contracts)**

21. Congress estimated that a large portion of the 367,000 units owned by both pre-1979 and post-1979 loan holders and originating between 1963 and 1985 were vulnerable

to being prepaid during the few years following 1988. Post-1979 FmHA loan holders, however, unlike pre-1979 loan holders, already were contractually required to maintain their projects as low- and moderate-income housing for fifteen (15) or twenty (20) years. Thus, until such time as Congress could act on recommendations resulting from the continuing reviews of alternative responses to the perceived imminent loss of affordable housing and devise a permanent solution for all FmHA loans, the 1988 Legislation confined itself to dealing only with the pre-1979 FmHA loans, i.e., those FmHA loans originating from 1963 to 1979.

22. The 1988 Legislation contained measures designed to place the pre-1979 FmHA contract holders "on the same playing field" as the post-1979 FmHA contract holders already subject to a restrictive-use clause. For example, a pre-1979 FmHA contract holder could avoid a forced sale of its project by agreeing to extend its low-income use for a period of not less than twenty (20) years from the date of loan origination. (The 1988 Legislation, Section 241.)

23. Although denominated as an "interim measure," the 1988 Legislation specifically amended existing law -- Section 502(c) of the Housing Act of 1949 -- and did not expire automatically. Instead of repealing the "interim measures" directed at pre-1979 FmHA contract holders, Congress devised, in 1992, a permanent response for all FmHA loans, including those post-1979 loans with contractual termination rights.

24. Consistent with the provisions of existing post-1979 FmHA contracts containing restrictive-use clauses, the 1988 Legislation recognized the contractual right of post-1979 FmHA loan holders to terminate their contracts by prepaying their loans at any

time at their option provided that the projects were maintained as low- and moderate-income housing for a period of fifteen (15) or twenty (20) years from the date of loan origination.

25. Contrary to the provisions of pre-1979 FmHA contracts, the 1988 Legislation repudiated the contractual right of FmHA contract holders to terminate their contracts at any time at their option. (The 1988 Legislation, Section 241.)

**The 1992 Legislation**

26. On October 28, 1992, Congress amended Section 502(c) of the Housing Act of 1949 by enacting the Housing and Community Development Act of 1992 (Pub. L. No. 102-550, § 2 & Tit. VII, § 712, 106 Stat. 3681, 3841 (1992)(codified in relevant part at 42 U.S.C. § 1472(c))("the 1992 Legislation or Title VII").) This amendment eliminated the interim measure status of the 1988 Legislation's provisions repudiating the contractual right of pre-1979 FmHA loan holders to terminate their contracts at any time at their option.

27. In addition to making permanent the temporary repudiation of the contractual termination rights of pre-1979 FmHA loan holders, the 1992 Legislation made permanent for all contracts formed before 1989 the restrictions that ELIHPA had imposed on pre-1979 FmHA contracts. (42 U.S.C. § 1472(c)(4)(A), as amended.)

28. For the first time, the 1992 Legislation permanently applied ELIHPA's restrictions to all FmHA contracts entered into before 1989. The statute made no exception for contracts entered into before 1979, nor did it single out (as ELIHPA had done for pre-1979 contracts) any special treatment for those contracts entered into between 1979 and 1989. Thus, the 1992 Legislation, signed into law by the President on November 2, 1992,

together with implementing regulations, permanently repudiates the contractual termination right of any FmHA loan holder who chooses to terminate its contract.

29. Pursuant to the 1992 Legislation, holders of both pre-1979 and post-1979 FmHA contracts are permitted to terminate their contracts by prepaying their loans only in accordance with specified, non-contractual restrictions, including but not limited to the requirement that, before accepting any offer to prepay, the Secretary must make reasonable efforts to enter into an agreement to extend the low-income use of FmHA projects for not less than a period of twenty (20) years beginning on the date the agreement is executed. (The 1992 Legislation, Section 712, 42 U.S.C. § 1472(c)(4)(A).)

30. The 1992 Legislation authorizes FmHA, subject to various conditions and at its discretion, to offer limited, specified "incentives" to holders of FmHA contracts which, along with the threat of the forced property sales discussed below, are designed to induce said contract holders to extend the low-income use of their projects. In general, the incentives allowed owners whose projects satisfied various guidelines to apply for: (i) increases in the rate of return on investment; (ii) reductions of the interest rate on the mortgage loan; (iii) additional rental assistance; and (iv) an equity loan. (42 U.S.C. § 1472(c)(4)(B).)

31. The appraisal guidelines used by FmHA to determine incentives are inconsistent with standard appraisal guidelines and result in value determinations below fair market value.

32. For those FmHA project owners unwilling or unable to extend their participation in the Government's housing programs by acquiescing to the "incentives" outlined above, the 1992 Legislation provides for forced sales of said owners' properties to

nonprofit organizations or public agencies approved by FmHA which are required to maintain the projects as low income housing, subject to FmHA's approval of financial assistance to the prospective purchasers. Under the lengthy, cumbersome, and costly procedures required, such owners are required to offer their properties for sale to such purchasers for an extended period without receiving "incentives" or any other compensation. (42 U.S.C. § 1472(c)(5)(A) - (F).)

33. Such forced sale proceedings can be avoided only if (i) the FmHA project owner agrees to continue to operate its project as low-income housing for a period determined by the Secretary, but not less than twenty (20) years from the date of loan origination, and to subject itself to the forced sale proceeding at the end of that period; or (ii) if the Secretary determines that housing opportunities for minorities will not be materially affected as a result of the prepayment and that either (a) tenants will not be displaced; or (b) there is an adequate supply of affordable rental housing within the market area of the housing that is assured of being made available to all current tenants. (42 U.S.C. § 1472(c)(5)(G).)

**Material Terms**

34. Plaintiffs' contractual right to terminate their contracts at any time at their option was a material term of their contracts. In the absence of this contractual termination right, plaintiffs would not have entered into their contracts with FmHA. But for the legislation repudiating plaintiffs' contractual termination right, plaintiffs would achieve their option of terminating their contracts on those dates that would maximize their investment return on their properties, or on such other dates as they would deem appropriate given their individual circumstances.

35. Plaintiffs have complied fully and in good faith in all material respects with the terms and conditions of their contracts and have otherwise fully performed their undertakings in connection therewith.

**THE IMPACT OF THE REPUDIATING LEGISLATION UPON PLAINTIFFS**

36. The statutory scheme under the 1988 and 1992 Legislation and FmHA's implementing regulations repudiate the contractual right of FmHA project owners to terminate their contracts at any time at their option in part by (i) compelling them to extend the low-income use of their properties; and (ii) subjecting them to forced sales of their properties. The Government's repudiation does not constitute a failure to carry out any immediate duty of present performance unless and until the date of Government performance required by each contract arrives, i.e., the date that any FmHA contract holder would have achieved its option of terminating its contract but for the Government's repudiation. Thus, the Government's scheme constitutes an anticipatory repudiation of the plaintiffs' contractual termination right.

37. The legislation complained of herein also results in a taking of plaintiffs' properties for public use without just compensation. By requiring plaintiffs to house low-income tenants and to accept new low-income tenants, the Government has (i) conscripted plaintiffs' properties for public use; (ii) physically invaded or authorized others to physically invade plaintiffs' properties; and (iii) deprived plaintiffs of their distinct investment-backed expectations with regard to their properties, all without providing any just compensation.

## DAMAGES

38. Plaintiffs intended, upon entering into their contracts with the FmHA, to exercise their prepayment right and terminate their participation in the Section 515 program prior to the expiration of their full mortgage terms. But for the Government's wrongful repudiation, plaintiffs would have prepaid their mortgage loans for the pre-1979 projects at issue here, Rustfield Village Elderly Apartments I, Rustfield Village Elderly Apartments II, and Sudbury Village Elderly Apartments, on or about September 24, 2004.

39. Thus, the plaintiffs commenced this civil action within six years after (1) the date that they intended to prepay their mortgage loans and terminate their contracts with the FmHA, and (2) the date that they would have prepaid but for the Government's repudiation of their contract rights.

40. Plaintiffs were ready, willing, and able to pay off their mortgage loan balances at the time they intended to exercise their right to prepay and leave the Section 515 program.

41. Plaintiffs have met with, or otherwise made inquiries of, FmHA officials regarding prepayment of their loans. Said Government officials have repeatedly represented to plaintiffs that prepayment without restrictions will not be accepted.

42. Notwithstanding the Government's conduct, on September 24, 2004 plaintiffs submitted a request for the prepayment of each of their mortgage loans. The Government has refused to accept prepayment from plaintiffs pursuant to the provision of their contracts.

43. The incentives and other alternatives potentially provided by the 1988 and 1992 Legislation and implementing regulations are wholly inconsistent with plaintiffs' original contract rights. Among other things, said incentives and alternatives would require

plaintiffs to negotiate substitute alternative transactions with the party that repudiated their contracts, thereby exposing them to unreasonable financial risks. Moreover, said incentives and alternatives fall far short of compensating plaintiffs for the damages they have suffered and will continue to suffer as a result of the Government's repudiation of their contracts with plaintiffs, and would not provide just compensation to plaintiffs for the taking of their properties for public use.

44. As a result of the Government's repudiation of their contractual termination right, plaintiffs have been (i) deprived of their right to use or dispose of their properties as they see fit; (ii) compelled to allow the Government to use or authorize others to purchase and use their properties to fulfill the Government's undertaking to provide low cost rental housing to a segment of the public meeting Government eligibility standards; and (iii) required to continue to comply with the costly restrictions and obligations imposed upon them by their Loan Agreements.

45. But for the Government's conduct, plaintiffs would have terminated their contracts by prepaying their mortgage loans and/or selling their properties to third parties. The Government has deprived and will deprive plaintiffs of earnings on the sale of their properties because its repudiation of plaintiffs' contractual termination right has prevented any prepayments, and consequently any sales, from taking place.

46. But for the Government's conduct, plaintiffs would have terminated their contracts by prepaying their mortgage loans and converting their properties into commercial housing for which they could obtain rents at market rates in excess of the rents chargeable to low- and moderate-income tenants under the Government's program. The Government has

deprived and will deprive plaintiffs of the value of increased rents they would receive because its repudiation of plaintiffs' contractual termination right has prevented any prepayment, and consequently any increase in rents, from taking place.

47. Plaintiffs have suffered other, additional damages including without limitation the lost opportunity costs associated with investment and business opportunities plaintiffs have been foreclosed from pursuing by virtue of their inability to exercise their contractual right to terminate their contracts at any time at their option.

## COUNT ONE

(Breach of Contract)

48. Plaintiffs incorporate paragraphs 1 through 47 by reference as if fully set forth herein.

49. Defendant's legislation anticipatorily repudiated each contract between the defendant and plaintiffs. The Government's anticipatory repudiation has deprived and will deprive plaintiffs of their contractual right to terminate each of their contracts at any time at their option before the expiration date of each contract's fifty (50)-year term. The Government's anticipatory repudiation constitutes a breach of plaintiffs' contracts as of the date of Government performance required by each contract, i.e., the date that plaintiffs would terminate each contract but for the Government's repudiation.

50. As a direct and proximate result of defendant's conduct, plaintiffs have been damaged in an amount that will be proven at trial. Plaintiffs are continuing to suffer injury and resulting damages each day that they are denied the ability to exercise their contractual termination right and go to market with their properties at any time at their option.

## COUNT TWO

(Just Compensation)

51. Plaintiffs incorporate paragraphs 1 through 50 by reference as if fully set forth herein.

52. As of the date of Government performance required by each contract entered into between defendant and plaintiffs, defendant's conduct constitutes a taking of plaintiffs' real and intangible property interests for public use and requires payment to plaintiffs of just compensation under the Fifth Amendment to the U.S. Constitution.

53. Plaintiffs are entitled to just compensation for the taking of their properties in an amount which will be proven at trial. Plaintiffs are continuing to suffer injury and resulting damages each day that they are denied the ability to convert their properties to market rate or conventional properties.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for judgment as follows:

## AS TO COUNT ONE

1. That the Court award plaintiffs monetary relief for the damages suffered to date and for the damages plaintiffs continue to suffer as a result of defendant's breaches of plaintiffs' contracts, in an amount to be determined at trial.

## AS TO COUNT TWO

2. That the Court award plaintiffs just compensation during the period during which plaintiffs' properties have been taken for public use by defendant, in an amount to be determined at trial.

**AS TO ALL COUNTS**

3. That the Court award plaintiffs their attorneys' fees and expenses as allowed pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c), and other applicable law.

4. That the Court award plaintiffs their costs and interest as allowed by law.

5. That the Court grant such other and further relief as the law and the evidence may justify and as the Court may deem just and proper.

Dated: December 29, 2005

Respectfully submitted,

By: ______________________

Jeff H. Eckland

Attorney for Plaintiffs

ECKLAND & BLANDO LLP
Mark J. Blando, Of Counsel
500 Lumber Exchange
10 South Fifth Street
Minneapolis, Minnesota 55402
Telephone: (612) 236-0160
Telecopy: (612) 236-0179

ORIGINAL

RECEIVED
DEC 3 0 2005
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

# In The United States Court of Federal Claims

ECF

## Cover Sheet

05-1395

Plaintiff(s) or Petitioner(s)
Jack E. Marshall

If this is a multi-plaintiff case, pursuant to RCFC 20(a), please attached an alphabetized, numbered list if all plaintiffs

Name of the attorney of record: [See RCFC 83.1(c)] Jeff H. Eckland

Firm Name: Eckland & Blando LLP

Post Office Box: ______

Street Address: 500 Lumber Exchange, 10 South Fifth Street

City-State-Zip: Minneapolis, MN 55402

Telephone & Facsimile Numbers: Phone: (612)236-0160 Fax: (612)236-0179

E-mail address: ecklandandblando@aol.com

Is the attorney of record admitted to the Court of Federal Claims Bar? Yes
If **NO**, please call (202) 219-9630 for admission papers and instructions.

Nature of suit code: 1 3 4

Select only one [three digit] nature of suit code from attached sheet and if numbers 118, 134, 226, 312, 356 or 528 are used, please explain.

______

______

Government Agency Involved: A G R

See attached Sheet for three digit code.

Amount Claimed: $ To be determined
If to be determined, put the phrase "to be determined" in Amount Claimed Space.

Vaccination Date: (Vaccine Cases Only) ______

If this case is related to any pending or previous case you are **required** to file a separate notice of related case(s). See RCFC 40.2

Receipt # ...

ORIGINAL

ECF

FILED
DEC 30 2005
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

JACK E. MARSHALL
31 Gardner Avenue #26,
Machias, ME 04654

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

**COMPLAINT FOR BREACH OF CONTRACT AND JUST COMPENSATION**

**File No.** 05-1395C

For his Complaint against the defendant United States of America, plaintiff states and alleges as follows:

## PRELIMINARY ALLEGATIONS

1. Plaintiff contracted with the United States of America ("the Government") for two loans to provide rental housing for low- and moderate-income persons for so long as the loan obligations remained unsatisfied ("the housing program"). The Government entered into these contracts ("the contracts") with plaintiff by and through its agency, the Farmers Home Administration, United States Department of Agriculture ("FmHA").

2. The terms of these contracts permit plaintiff to terminate his participation in the Government's housing program "at the option" of plaintiff upon prepayment of his federally made or insured mortgages. Pursuant to the contracts, said optional termination right could be exercised by plaintiff "at any time" prior to the termination of the fifty (50)-year term of his contracts.

3. Congress in 1988 and 1992 enacted legislation that repudiated the Government's contractual obligation to permit FmHA contract holders to terminate their contracts at any time at their option. As is alleged more fully below, plaintiff contends in this action that the enactment of this legislation anticipatorily repudiates the contracts between defendant and plaintiff. As is his right, plaintiff has elected to treat the Government's anticipatory repudiation as a breach of contract as of the date of Government performance required by the contracts, i.e., the date that plaintiff would achieve his option of terminating his contracts but for the Government's repudiation. Plaintiff also alleges that said legislation results in a taking of plaintiff's property without just compensation.

4. Plaintiff seeks to recover in this action the damages he has suffered and continues to suffer as a result of the breach by the Government of plaintiff's contracts and for just compensation for the taking of his properties.

**(Pre-1979 FmHA Contracts)**

5. Plaintiff entered into his FmHA contracts before December 21, 1979 ("the pre-1979 FmHA contracts"), and thereby is contractually entitled to terminate his participation in the Government's housing program by exercising his option to prepay at any time. Such a prepayment would enable him to "go to market" and use or dispose of his property by either (i) raising the property's rents to commercial rates; or (ii) selling the property for its commercial fair market value.

6. The 1988 Legislation described below repudiated the contractual right of pre-1979 FmHA contract holders to terminate their contracts at any time at their option.

**THE PARTIES**
**(Party Plaintiff)**

7. Plaintiff, Jack E. Marshall, with an address at 31 Gardner Avenue #26, Machias, ME 04654, entered into two contracts for rental housing at the following properties known as:

(i) Louise Gardner Apartments, case and project number 23-015-461364361-01-06, consisting of twenty (20) units, which closed on July 26, 1974; and

(ii) Riverside Apartments, case and project number 23-015-461364361, consisting of sixteen (16) units, which closed on August 2, 1977.

**(Party Defendant)**

8. The FmHA is an agency of the defendant. At all times relevant to the allegations in this Complaint, FmHA and its respective officials and employees were acting as agents of the defendant. Pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, § 233, 108 Stat. 3178 (1994), the Secretary of the Department of Agriculture was authorized to establish a successor agency to Farmers Home Administration known as Rural Housing and Community Development Services ("RHCDS"). Effective January 30, 1996, RHCDS changed its name to Rural Housing Service ("RHS"). (Agency Name Change, 61 Fed. Reg. 2899 (1996).) RHS is itself part of the area within the Department of Agriculture known as "Rural Development." As used herein, "FmHA" shall refer to Farmers Home Administration or its successor agencies, as appropriate.

9. An actual controversy exists between the parties.

## JURISDICTION

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491.

## BACKGROUND

11. Prior to the 1960s, Congress sought to provide low-income housing primarily by subsidizing projects developed, owned, and managed by local government public housing authorities. During the 1960s and the 1970s, Congress changed its approach and enacted legislation to encourage private developers to construct, own, and manage large numbers of federally assisted housing units for low- and moderate-income residents.

12. In furtherance of this changed approach, Congress authorized FmHA to make or insure loans to private entities in order to stimulate the private development of federally assisted housing for low- and moderate-income and elderly residents in rural areas of the United States. Congress began this program in 1962 by adding Section 515 to the Housing Act of 1949 (Pub. L. No. 87-723, § 4(b), 76 Stat. 671 (1962)) and expanded its scope in 1968 by adding Section 521 to that Act (Pub. L. No. 90-448, Tit. X, § 1001, 82 Stat. 551 (1968))(now codified at 42 U.S.C. §§ 1485 and 1490a, respectively). Housing projects subject to Sections 515 and/or 521 of the Housing Act of 1949 are referred to herein as "FmHA projects."

13. Plaintiff agreed, under Sections 515 and/or 521 of the Housing Act of 1949, as amended, 42 U.S.C. §§ 1485 and 1490a, to construct, rehabilitate, or improve two housing projects and to enter into Loan Agreements with the FmHA. The Loan Agreements, *inter alia*, imposed significant obligations on plaintiff regarding the tenants to whom plaintiff

could rent, the rents he could charge, the profits he could receive, and the maintenance and financial operation of the projects ("the low income affordability restrictions").

14. Contemporaneous with the execution of the Loan Agreements, and referenced therein, the plaintiff executed, *inter alia*, a Promissory Note and Real Estate Mortgage for each project. In executing the Promissory Notes, plaintiff promised to pay to the order of the Government, in scheduled installments, the entire principal due pursuant to the Loan Agreements, together with interest at a specified rate. The Promissory Notes provided, *inter alia*, "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower."

15. By signing the Loan Agreements and the Promissory Notes referenced therein, plaintiff promised, *inter alia*, (i) to construct and maintain housing in accordance with FmHA's specifications; (ii) to use his FmHA projects for the purpose of housing people eligible for occupancy as provided by Section 515 and appropriate FmHA regulations; (iii) to charge no higher rents than those permitted by FmHA; (iv) to make timely payments on his mortgages; and (v) to maintain certain cash reserves. In exchange, the Government agreed to allow plaintiff to free himself of FmHA's regulatory strictures in accordance with the contractual provisions of the Promissory Notes.

16. The Loan Agreements obligate the plaintiff to operate his housing properties in accordance with FmHA regulatory strictures only so long as plaintiff's indebtedness and other obligations under the Promissory Notes, Real Estate Mortgages, and any related agreement remain unsatisfied. Thus, plaintiff's obligation under the Loan Agreements to

operate his housing properties in accordance with FmHA regulations expires upon his prepayment in full of his indebtedness and satisfaction of any related obligations.

17. Consistent with the language of the Promissory Note, FmHA regulations codified at, *inter alia,* parts 1865, 1866, and 1965, implementing Section 502 of the Housing Act of 1949, 42 U.S.C. § 1472, permit plaintiff to prepay his mortgage loans at any time at his option so long as he and his successors in interest comply with any applicable restrictive-use clause contained in the Real Estate Mortgages.

18. Accordingly, plaintiff is entitled under his Loan Agreements with FmHA, FmHA's regulations, and the Promissory Notes, to terminate his contracts by prepaying his mortgage loans at any time at his option to enable him to go to market and maximize his return on investment.

19. Notwithstanding plaintiff's contractual right to terminate his participation in the Government's housing program, the Government repudiated its obligation to recognize plaintiff's right by enacting the legislation described below.

## CONGRESSIONAL ACTION

### The 1988 Legislation

20. On February 5, 1988, Congress imposed restrictions on prepayment, thereby repudiating the right of pre-1979 FmHA contract holders to exercise their contractual termination right at any time at their option, by enacting Title II of the Housing and Community Development Act of 1987. (Pub. L. No. 100-242, 101 Stat. 1877 (1988), cited as the Emergency Low Income Housing Preservation Act of 1987 (codified as amended at 42 U.S.C. § 1472(c) and 12 U.S.C. § 1715*l* note)("the 1988 Legislation" or "ELIHPA").)

Congress made certain findings in the 1988 Legislation, including but not limited to the following:

> (i) some 150,000 units of rural low income housing financed under section 515 of the Housing Act of 1949 [i.e., FmHA housing units] are threatened with loss as a result of the prepayment of mortgages by owners;
>
> (ii) the loss of this privately owned and federally assisted housing would occur in a period of sharply rising rents on unassisted housing and extremely low production of additional low rent housing;
>
> (iii) a major review of alternative responses to this threatened loss of affordable housing is now being undertaken by numerous private sector task forces as well as State and local organizations;
>
> (iv) until the Congress can act on recommendations that will emerge from this review, interim measures are needed to avoid the irreplaceable loss of low income housing and irrevocable displacement of current tenants.

(The 1988 Legislation, Section 202(a).)

**(The 1988 Legislation's Prepayment Restrictions For Pre-1979 FmHA Contracts)**

21. Congress estimated that a large portion of the 367,000 units owned by both pre-1979 and post-1979 loan holders and originating between 1963 and 1985 were vulnerable to being prepaid during the few years following 1988. Post-1979 FmHA loan holders, however, unlike pre-1979 loan holders, already were contractually required to maintain their projects as low- and moderate-income housing for fifteen (15) or twenty (20) years. Thus, until such time as Congress could act on recommendations resulting from the continuing

reviews of alternative responses to the perceived imminent loss of affordable housing and devise a permanent solution for all FmHA loans, the 1988 Legislation confined itself to dealing only with the pre-1979 FmHA loans, i.e., those FmHA loans originating from 1963 to 1979.

22. The 1988 Legislation contained measures designed to place the pre-1979 FmHA contract holders "on the same playing field" as the post-1979 FmHA contract holders already subject to a restrictive-use clause. For example, a pre-1979 FmHA contract holder could avoid a forced sale of its project by agreeing to extend its low-income use for a period of not less than twenty (20) years from the date of loan origination. (The 1988 Legislation, Section 241.)

23. Although denominated as an "interim measure," the 1988 Legislation specifically amended existing law -- Section 502(c) of the Housing Act of 1949 -- and did not expire automatically. Instead of repealing the "interim measures" directed at pre-1979 FmHA contract holders, Congress devised, in 1992, a permanent response for all FmHA loans, including those post-1979 loans with contractual termination rights.

24. Consistent with the provisions of existing post-1979 FmHA contracts containing restrictive-use clauses, the 1988 Legislation recognized the contractual right of post-1979 FmHA loan holders to terminate their contracts by prepaying their loans at any time at their option provided that the projects were maintained as low- and moderate-income housing for a period of fifteen (15) or twenty (20) years from the date of loan origination.

25. Contrary to the provisions of pre-1979 FmHA contracts, the 1988 Legislation repudiated the contractual right of FmHA contract holders to terminate their contracts at any time at their option. (The 1988 Legislation, Section 241.)

**The 1992 Legislation**

26. On October 28, 1992, Congress amended Section 502(c) of the Housing Act of 1949 by enacting the Housing and Community Development Act of 1992 (Pub. L. No. 102-550, § 2 & Tit. VII, § 712, 106 Stat. 3681, 3841 (1992)(codified in relevant part at 42 U.S.C. § 1472(c))("the 1992 Legislation or Title VII").) This amendment eliminated the interim measure status of the 1988 Legislation's provisions repudiating the contractual right of pre-1979 FmHA loan holders to terminate their contracts at any time at their option.

27. In addition to making permanent the temporary repudiation of the contractual termination rights of pre-1979 FmHA loan holders, the 1992 Legislation made permanent for all contracts formed before 1989 the restrictions that ELIHPA had imposed on pre-1979 FmHA contracts. (42 U.S.C. § 1472(c)(4)(A), as amended.)

28. For the first time, the 1992 Legislation permanently applied ELIHPA's restrictions to all FmHA contracts entered into before 1989. The statute made no exception for contracts entered into before 1979, nor did it single out (as ELIHPA had done for pre-1979 contracts) any special treatment for those contracts entered into between 1979 and 1989. Thus, the 1992 Legislation, signed into law by the President on November 2, 1992, together with implementing regulations, permanently repudiates the contractual termination right of any FmHA loan holder who chooses to terminate its contract.

29. Pursuant to the 1992 Legislation, holders of both pre-1979 and post-1979 FmHA contracts are permitted to terminate their contracts by prepaying their loans only in accordance with specified, non-contractual restrictions, including but not limited to the requirement that, before accepting any offer to prepay, the Secretary must make reasonable efforts to enter into an agreement to extend the low-income use of FmHA projects for not less than a period of twenty (20) years beginning on the date the agreement is executed. (The 1992 Legislation, Section 712, 42 U.S.C. § 1472(c)(4)(A).)

30. The 1992 Legislation authorizes FmHA, subject to various conditions and at its discretion, to offer limited, specified "incentives" to holders of FmHA contracts which, along with the threat of the forced property sales discussed below, are designed to induce said contract holders to extend the low-income use of their projects. In general, the incentives allowed owners whose projects satisfied various guidelines to apply for: (i) increases in the rate of return on investment; (ii) reductions of the interest rate on the mortgage loan; (iii) additional rental assistance; and (iv) an equity loan. (42 U.S.C. § 1472(c)(4)(B).)

31. The appraisal guidelines used by FmHA to determine incentives are inconsistent with standard appraisal guidelines and result in value determinations below fair market value.

32. For those FmHA project owners unwilling or unable to extend their participation in the Government's housing programs by acquiescing to the "incentives" outlined above, the 1992 Legislation provides for forced sales of said owners' properties to nonprofit organizations or public agencies approved by FmHA which are required to maintain the projects as low income housing, subject to FmHA's approval of financial

assistance to the prospective purchasers. Under the lengthy, cumbersome, and costly procedures required, such owners are required to offer their properties for sale to such purchasers for an extended period without receiving "incentives" or any other compensation. (42 U.S.C. § 1472(c)(5)(A) - (F).)

33. Such forced sale proceedings can be avoided only if (i) the FmHA project owner agrees to continue to operate its project as low-income housing for a period determined by the Secretary, but not less than twenty (20) years from the date of loan origination, and to subject itself to the forced sale proceeding at the end of that period; or (ii) if the Secretary determines that housing opportunities for minorities will not be materially affected as a result of the prepayment and that either (a) tenants will not be displaced; or (b) there is an adequate supply of affordable rental housing within the market area of the housing that is assured of being made available to all current tenants. (42 U.S.C. § 1472(c)(5)(G).)

## Material Terms

34. Plaintiff's contractual right to terminate his contracts at any time at his option was a material term of his contracts. In the absence of this contractual termination right, plaintiff would not have entered into his contracts with FmHA. But for the legislation repudiating plaintiff's contractual termination right, plaintiff would achieve his option of terminating his contracts on those dates that would maximize his investment return on his properties, or on such other dates as he would deem appropriate given his individual circumstances.

35. Plaintiff has complied fully and in good faith in all material respects with the terms and conditions of his contracts and has otherwise fully performed his undertakings in connection therewith.

## THE IMPACT OF THE REPUDIATING LEGISLATION UPON PLAINTIFF

36. The statutory scheme under the 1988 and 1992 Legislation and FmHA's implementing regulations repudiate the contractual right of FmHA project owners to terminate their contracts at any time at their option in part by (i) compelling them to extend the low-income use of their properties; and (ii) subjecting them to forced sales of their properties. The Government's repudiation does not constitute a failure to carry out any immediate duty of present performance unless and until the date of Government performance required by each contract arrives, i.e., the date that any FmHA contract holder would have achieved its option of terminating its contract but for the Government's repudiation. Thus, the Government's scheme constitutes an anticipatory repudiation of the plaintiff's contractual termination right.

37. The legislation complained of herein also results in a taking of plaintiff's properties for public use without just compensation. By requiring plaintiff to house low-income tenants and to accept new low-income tenants, the Government has (i) conscripted plaintiff's properties for public use; (ii) physically invaded or authorized others to physically invade plaintiff's properties; and (iii) deprived plaintiff of his distinct investment-backed expectations with regard to his properties, all without providing any just compensation.

## DAMAGES

38. Plaintiff intended, upon entering into his contracts with the FmHA, to exercise his prepayment right and terminate his participation in the Section 515 program prior to the expiration of his full mortgage terms. But for the Government's wrongful repudiation, plaintiff would have prepaid his mortgage loan for the pre-1979 project at issue here, Louise Gardner Apartments, on or about May 29, 2000. But for the Government's wrongful repudiation, plaintiff would have prepaid his mortgage loan for the pre-1979 project at issue here, Riverside Apartments, on or about April 30, 2000.

39. Thus, the plaintiff commenced this civil action within six years after (1) the dates that he intended to prepay his mortgage loans and terminate his contracts with the FmHA, and (2) the dates that he would have prepaid but for the Government's repudiation of his contract right.

40. Plaintiff was ready, willing, and able to pay off his mortgage loan balances at the times he intended to exercise his right to prepay and leave the Section 515 program.

41. Plaintiff has met with, or otherwise made inquiries of, FmHA officials regarding prepayment of his loans. Said Government officials have repeatedly represented to plaintiff that prepayment without restrictions will not be accepted.

42. Notwithstanding the Government's conduct, during or about April 1999 plaintiff submitted a request to prepay the mortgage loan on the Riverside Apartments property "once the [project's] HUD Section 8 contract expires [i.e., on April 30, 2000]." The Government has failed and refused to accept any prepayment from plaintiff pursuant to the provisions of his contract.

43. The incentives and other alternatives potentially provided by the 1988 and 1992 Legislation and implementing regulations are wholly inconsistent with plaintiff's original contract rights. Among other things, said incentives and alternatives would require plaintiff to negotiate substitute alternative transactions with the party that repudiated his contracts, thereby exposing him to unreasonable financial risks. Moreover, said incentives and alternatives fall far short of compensating plaintiff for the damages he has suffered and will continue to suffer as a result of the Government's repudiation of its contracts with plaintiff, and would not provide just compensation to plaintiff for the taking of his properties for public use.

44. As a result of the Government's repudiation of his contractual termination right, plaintiff has been (i) deprived of his right to use or dispose of his properties as he sees fit; (ii) compelled to allow the Government to use or authorize others to purchase and use his properties to fulfill the Government's undertaking to provide low cost rental housing to a segment of the public meeting Government eligibility standards; and (iii) required to continue to comply with the costly restrictions and obligations imposed upon him by his Loan Agreements.

45. But for the Government's conduct, plaintiff would have terminated his contracts by prepaying his mortgage loans and/or selling his properties to third parties. The Government has deprived and will deprive plaintiff of earnings on the sale of his properties because its repudiation of plaintiff's contractual termination right has prevented any prepayment, and consequently any sale, from taking place.

46. But for the Government's conduct, plaintiff would have terminated his contracts by prepaying his mortgage loans and converting his properties into commercial housing for which he could obtain rents at market rates in excess of the rents chargeable to low- and moderate-income tenants under the Government's program. The Government has deprived and will deprive plaintiff of the value of increased rents he would receive because its repudiation of plaintiff's contractual termination right has prevented any prepayment, and consequently any increase in rents, from taking place.

47. Plaintiff has suffered other, additional damages including without limitation the lost opportunity costs associated with investment and business opportunities plaintiff has been foreclosed from pursuing by virtue of his inability to exercise his contractual right to terminate his contracts at any time at his option.

## COUNT ONE

(Breach of Contract)

48. Plaintiff incorporates paragraphs 1 through 47 by reference as if fully set forth herein.

49. Defendant's legislation anticipatorily repudiated the contracts between the defendant and plaintiff. The Government's anticipatory repudiation has deprived and will deprive plaintiff of his contractual right to terminate his contracts at any time at his option before the expiration date of his fifty (50)-year contract terms. The Government's anticipatory repudiation constitutes a breach of plaintiff's contracts as of the date of Government performance required by each contract, i.e., the dates that plaintiff would terminate his contracts but for the Government's repudiation.

50. As a direct and proximate result of defendant's conduct, plaintiff has been damaged in an amount which will be proven at trial. Plaintiff is continuing to suffer injury and resulting damages each day that he is denied the ability to exercise his contractual termination right and go to market with his properties at any time at his option.

**COUNT TWO**

(Just Compensation)

51. Plaintiff incorporates paragraphs 1 through 50 by reference as if fully set forth herein.

52. As of the date of Government performance required by each contract entered into between defendant and plaintiff, defendant's conduct constitutes a taking of plaintiff's real and intangible property interests for public use and requires payment to plaintiff of just compensation under the Fifth Amendment to the U.S. Constitution.

53. Plaintiff is entitled to just compensation for the taking of his properties in an amount which will be proven at trial. Plaintiff is continuing to suffer injury and resulting damages each day that he is denied the ability to convert his properties to market rate or conventional properties.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment as follows:

**AS TO COUNT ONE**

1. That the Court award plaintiff monetary relief for the damages suffered to date and for the damages plaintiff continues to suffer as a result of defendant's breach of plaintiff's contracts, in an amount to be determined at trial.

**AS TO COUNT TWO**

2. That the Court award plaintiff just compensation during the period during which plaintiff's properties have been taken for public use by defendant, in an amount to be determined at trial.

**AS TO ALL COUNTS**

3. That the Court award plaintiff its attorneys' fees and expenses as allowed pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c), and other applicable law.

4. That the Court award plaintiff his costs and interest as allowed by law.

5. That the Court grant such other and further relief as the law and the evidence may justify and as the Court may deem just and proper.

Dated: December 29, 2005

Respectfully submitted,

By: [signature]

Jeff H. Eckland

Attorney for Plaintiff

ECKLAND & BLANDO LLP
Mark J. Blando, Of Counsel
500 Lumber Exchange
10 South Fifth Street
Minneapolis, Minnesota 55402
Telephone: (612) 236-0160
Facsimile: (612) 236-0179